## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAMES BLOUNT,<br>individually and on behalf of the<br>class defined herein,<br><br>    Plaintiff,<br><br>  vs.<br><br>MIDLAND CREDIT MANAGEMENT, INC.;<br>MIDLAND FUNDING NCC-2 CORPORATION;<br>and ENCORE CAPITAL GROUP, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

```
FILED: APRIL 24, 2008
08CV2331        AEE
JUDGE ASPEN
MAGISTRATE JUDGE KEYS
```

### COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff James Blount brings this action to secure redress from unlawful credit and collection practices engaged in by defendants.  Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

2. The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information.  15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

3. Specifically, plaintiff alleges that defendants systematically engaged in filing and threatening lawsuits on time-barred debts which they purchase for a few cents on the dollar.

### VENUE AND JURISDICTION

4. This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28  U.S.C. §1331, and 28 U.S.C. §1337.

5. Venue and personal jurisdiction in this District are proper because:

  a. Defendants' collection communications and activities impacted

plaintiff within this District;

        b.    Each defendant does business or is located within this District.

## PARTIES

### Plaintiff

6.    Plaintiff James Blount resides in the Northern District of Illinois.

### Midland Funding NCC-2 Corporation

7.    Defendant Midland Funding NCC-2 Corporation ("NCC") is a Delaware corporation. Its principal place of business is 8875 Aero Drive, Suite 200, San Diego, CA 92123. Its address for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

8.    Defendant NCC is in the business of taking title to charged-off debts allegedly owed by consumers, including automobile contract and lease debts, for a small fraction of face value and enforcing the debts against the consumers.

9.    Defendant NCC has been the plaintiff in more than 1,000 collection actions against Illinois residents.

10.    Defendant NCC is a "debt collector" as defined in the FDCPA.

11.    Defendant NCC transacts business in Illinois.

### Midland Credit Management

12.    Defendant MCM is a Kansas corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123. MCM transacts business in Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

13.    Defendant MCM is a collection agency and collects the charged-off debts held in the names of NCC and other subsidiaries of Encore (described below).

14.    Defendant MCM is a "debt collector" as defined in the FDCPA.

2

**Encore**

15.     MCM and NCC are under common ownership.  All are subsidiaries of
Encore, a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San
Diego, CA 92123.

16.     Encore describes itself as "a leading accounts receivable management
firm" and a "purchaser and manager of charged-off consumer receivables portfolios."  (Form 8-K
filed by Encore with the SEC on March 3, 2005).

17.     One of the principal types of debts collected by Encore and its subsidiaries
is auto lease and contract receivables.  According to Encore's Form 10-K for the period ending
December 31, 2007 (original p. 3), "The receivable portfolios we purchase consist primarily of
unsecured, charged-off domestic consumer credit card, auto loan deficiency and telecom
receivables purchased from national financial institutions, major retail credit corporations,
telecom companies and resellers of such portfolios."  Similarly, page 56 of the same document
states: "The receivable portfolios the Company purchases consist primarily of unsecured,
charged-off domestic consumer credit card, auto deficiency, and telecom receivables purchased
from national financial institutions, major retail credit corporations, telecom companies and
resellers of such portfolios.  Acquisitions of receivable portfolios are financed by operations and
by borrowings from third parties. See Note 8 for further discussion of the Company's debt."

18.     Encore intentionally and regularly obtains auto receivables that went into
default more than 4 years previously and has its subsidiaries collect them.  The Encore 10-K for
the period ending December 31, 2006 stated "The impairment on the 2005 pool group was the
result of lower than expected collections related to automotive deficiencies that were in excess of
80 months from charge off at the time of purchase...."  (Original p. 28).

19.     On March 10, 2005, Encore stated to public investors that it is a "50 year
old purchaser and manager of consumer receivables portfolios."  (Form 8-K filed by Encore
with the SEC on March 10, 2005).

3

20.    Encore "acquires its receivable portfolios at deep discounts from their face values using its proprietary valuation process that is based on the consumer attributes of the underlying accounts." (Form 10-K filed by Encore with the SEC for the year ending December 31, 2006, original p. E). By "deep discount" is meant 3.0 to 3.36% of face value. (*Id.*, original p. 28).

21.    Encore states that it is responsible for developing collection strategies. Thus, on March 3, 2005, Encore stated to public investors that:

> Our fourth quarter performance capped a very strong year for Encore, as we generated record levels of collections, revenues, and earnings per share.... We were able to achieve this strong growth despite scaling back on our purchasing of new portfolios throughout much of 2004 in response to less attractive pricing in the marketplace. Total purchases during 2004 were $103.4 million compared to $89.8 million in 2003. We continue to effectively develop alternative collection channels, such as legal and agency outsourcing, which increase our ability to penetrate our portfolios further....

The statement was made by Carl C. Gregory, III, then-Vice Chairman and CEO of Encore Capital Group, Inc. (Form 8-K filed by Encore with the SEC on March 3, 2005).

22.    The collection strategies Encore devises include collection strategies for auto deficiencies. On information and belief, Encore has or had a "Vice President of Auto Deficiency Solutions" in charge of this task.

23.    Encore is also responsible for raising money to purchase the charged-off debts.

24.    Encore has various subsidiaries, such as NCC, take title to the debts it purchases. These subsidiaries do not have employees.

25.    On March 3, 2005, Encore CEO Gregory stated in an earnings conference call:

> It's notable that we achieved this strong growth despite scaling back on our purchases of new portfolios for the better part of 2004, because of a less attractive pricing environment. As we have mentioned many times, one of our competitive advantages is our varied business model that makes use of several different collection channels. During the fourth quarter we continued to see increased production out of our legal channel and our contingent agency outsourcing channel, which was developed earlier in 2004. For the full year, our collections

4

through alternative channels, with the exception of the sales channel, more than doubled.

Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive, and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down.

With that being said, we invested $46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices, and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company.

26.    On August 3, 2004, Encore CEO Gregory stated in another earnings call:

We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.

The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.

The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.

We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external

legal, and our recently developed agency outsourcing strategy.

27.     Encore's involvement in the collection process is such as to make it a "debt collector" as defined in the FDCPA.

28.     All of the defendants herein are under common control as well as ownership, with common or overlapping officers and directors.

29.     Plaintiff is an individual who resides in the Northern District of Illinois.

## FACTS

30.     On or about July 17, 2007, a lawsuit was filed against plaintiff James Blount in the Circuit Court of DuPage County to collect a purported auto retail installment contract debt incurred for personal, family or household purposes.  The suit was filed in the name of Midland Funding NCC-2 Corp.  See Exhibit A.  On information and belief, defendant Midland Credit Management, Inc., actually made the decision to file suit.

31.     The charges for which recovery was sought in the lawsuit were more than 4 years old at the time of suit.

32.     The complaint alleged that the debt was in default and the automobile had been repossessed by the original creditor, Household Automotive Financial, no later than August 3, 2001.

33.     The complaint filed against Mr. Blount therefore, on its face, sought to enforce a supposed debt that had been in default more than four years.

34.     The statute of limitations applicable to the collection of auto retail installment contract and lease debts is four years under sections 2-725 and 2A-506 of the Uniform Commercial Code.  *Citizens National Bank of Decatur v. Farmer*, 77 Ill. App. 3d 56; 395 N.E.2d 1121 (4th Dist. 1979); *Fallimento C.Op.M.A. v. Fischer Crane Co.*, 995 F.2d 789 (7th Cir. 1993); *Associates Discount Corp. v. Palmer*, 47 N.J. 183, 219 A.2d 858 (1966); *Massey-Ferguson Credit Corp. v. Casaulong*, 62 Cal. App. 3d 1024, 133 Cal. Rptr. 497 (1976); *Jack Heskett Lincoln-Mercury v. Metcalf*, 158 Cal. App. 3d 38; 204 Cal. Rptr. 355 (1984); *Worrel v. Farmers Bank of*

*Delaware*, 430 A.2d 469 (Del. 1981); *Barnes v. Community Trust Bank*, 121 S.W.3d 520 (Ky. App. 2003); *First of Am. Bank v. Thompson*, 217 Mich. App. 581; 552 N.W.2d 516 (1996).

35.     Section 2-725 of the UCC, applicable to retail installment contracts, provides: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued...." The Illinois citation is 810 ILCS 5/2-725.

36.     Section 2A-506 of the UCC, applicable to leases, provides: "An action for default under a lease contract, including breach of warranty or indemnity, must be commenced within 4 years after the cause of action accrued...." The Illinois citation is 810 ILCS 5/2A-506.

37.     Hereinafter, the 6 states of: Illinois, New Jersey, California, Delaware, Kentucky and Michigan are referred to as the "applicable jurisdictions."

38.     "[T]he assignee *** takes the assignor's interest subject to all legal and equitable defenses existing at the time of the assignment." *John O. Schofield, Inc. v. Nikkel*, 314 Ill. App. 3d 771, 783, 731 N.E.2d 915 (5th Dist. 2000).  "[T]he assignee stands in the shoes of the assignor and, in so doing, is subject to any defense that might be urged against the assignor." *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App. 3d 610, 617, 518 N.E.2d 187 (1st Dist. 1987).  This includes the statute of limitations. *Coryell v. Klehm*, 157 Ill. 462; 41 N.E. 864, 868-69 (1895).

39.     Defendants regularly file and threaten to file suit on auto retail installment contract and lease debts.

40.     Defendants regularly file and threaten to file and cause the filing of suit on auto retail installment contract and lease debts in the applicable jurisdictions that are more than four years old at the time of the filing or threat.

41.     Defendants, as regular collectors of auto retail installment contract and lease debts, knew or should have known that the statute of limitations applicable to such debts is four years.

42.     Defendants engage in a pattern and practice of filing suit on time-barred debts.

7

## COUNT I – FDCPA – FILING SUIT ON TIME-BARRED DEBTS

43.    Plaintiff incorporates paragraphs 1-44.

44.    This claim is against all defendants.

45.    The filing and prosecution of time-barred lawsuits is both a deceptive collection practice, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(5), and 1692e(10), and an unfair collection practice, in violation of 15 U.S.C. §1692f.

46.    Section 1692e provides:

**§ 1692e.        False or misleading representations [Section 807 of P.L.]**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

**(2)      The false representation of--**

**(A)      the character, amount, or legal status of any debt; . . .**

**(5)      The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .**

**(10)      The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

47.    Section 1692f provides:

**§ 1692f.        Unfair practices [Section 808 of P.L.]**

**A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .**

## CLASS ALLEGATIONS

48.    Plaintiff brings this claim against the defendants on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).  The class consists of (a) all individuals with addresses in one of the applicable jurisdictions (b) against whom defendants filed or caused to be filed lawsuits (c) to collect auto retail installment contract or lease debts (d) more than four years after the later of default, repossession or charge off, (e) which lawsuit was pending at any time

during a period beginning one year prior to the filing of this action and ending 20 days after the filing of this action.

49.     The class is so numerous that joinder of all members is not practicable.

50.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether defendant engages in a practice of filing time-barred complaints and whether such practice violates the FDCPA.

51.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

52.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

53.     A class action is superior for the fair and efficient adjudication of this matter, in that:

a.     Individual actions are not economically feasible.

b.     Members of the class are likely to be unaware of their rights;

c.     Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendants for:

(1)     Statutory damages;

(2)     Actual damages;

(3)     Attorney's fees, litigation expenses and costs of suit;

(4)     Such other and further relief as the Court deems proper.

_____
Daniel A. Edelman

9

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

_____
Daniel A. Edelman

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

12

08CV2331  AEE
JUDGE ASPEN
MAGISTRATE JUDGE KEYS

# EXHIBIT A



5350

1828765

# IN THE CIRCUIT COURT OF DUPAGE COUNTY, ILLINOIS
## EIGHTEENTH JUDICIAL CIRCUIT

MIDLAND FUNDING NCC-2 CORP                )
                              Plaintiff         )         *Total claim $6648.00 plus costs*

             vs.                                       )   No.2007SR001486

JAMES BLOUNT                                      )   Total Claim: $16,648.00

                  Defendant     )

**FILED**
JUL 17 2007   7:31 AM

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY ILLINOIS

## COMPLAINT

The Plaintiff claims as follows:

1. The Plaintiff, MIDLAND FUNDING NCC-2 CORP, is a corporation authorized to do business in the State of Illinois, and the defendant, JAMES BLOUNT, is a resident of DUPAGE County, Illinois.

2. Defendant, JAMES BLOUNT, being justly indebted to plaintiff, entered into a SIMPLE INTEREST MOTOR VEHICLE CONTRACT AND SECURITY AGREEMENT with plaintiff's assignor on or about 12-15-99 (See Exhibit 1 attached).

3. Plaintiff is the assignee of said account from HOUSEHOLD AUTOMOTIVE FINANCIAL CORP having purchased said account in the regular course of business in good faith and for value.

4. The defendant defaulted under the terms and conditions of the contract. Pursuant thereto the plaintiff's assignor declared said Contract to be in default and reclaimed said automobile from the defendant, on or about 08-03-01.

5. The plaintiff's assignor sold said automobile pursuant to the terms of the Contract, and the proceeds of the sale were applied as follows:

| | |
|---|---:|
| Gross Balance at time of repossession | $6656.86 |
| Late Fees | 78.55 |
| Net Balance due immediately prior to disposition of vehicle | $6735.41 |
| | |
| Rebate of unearned portion of finance charge | $ 0 |
| Rebate from Dealer Reserve | $ 0 |
| Rebate of Insurance (unused) | $ 0 |
| TOTAL REBATES | $ 0 |
| Credit for Proceeds of Sale (if goods have been repossessed and sold) | $ 900.00 |
| LESS TOTAL CREDITS | -$900.00 |