## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BLOUNT, | ) | |
| individually and on behalf of the | ) | |
| class defined herein, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 2331 |
| | ) | Judge Aspen |
| vs. | ) | Magistrate Judge Keys |
| | ) | |
| MIDLAND CREDIT MANAGEMENT, INC.; | ) | |
| MIDLAND FUNDING NCC-2 CORPORATION; | ) | |
| and ENCORE CAPITAL GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff respectfully requests that this Court enter an order determining that this Fair Debt Collection Practices Act ("FDCPA") action may proceed as a class action against defendants Midland Credit Management, Inc. ("MCM"), Midland Funding NCC-2 Corp. ("NCC2"), and Encore Capital Group, Inc. ("Encore") (collectively "Defendants").

Plaintiff defines the class as:  (a) all individuals with addresses in one of the applicable jurisdictions (b) against whom defendants filed or caused to be filed lawsuits (c) to collect auto retail installment contract or lease debts (d) more than four years after the later of default, repossession or charge off, (e) which lawsuit was pending at any time during a period beginning one year prior to the filing of this action and ending 20 days after the filing of this action.

Plaintiff further requests that Edelman, Combs, Latturner & Goodwin, LLC be appointed counsel for the class.

In support of this motion, plaintiff states:

### NATURE OF THE CASE

1.     This case arises out of Defendants' policy and practice of bringing, or threatening to bring, time-barred lawsuits to collect auto retail installment contract and lease

1

debts.  The statute of limitations applicable to the collection of auto retail installment contract and lease debts is four years under sections 2-725 and 2A-506 of the Uniform Commercial Code. *Citizens National Bank of Decatur v. Farmer*, 77 Ill. App. 3d 56; 395 N.E.2d 1121 (4th Dist. 1979); *Fallimento C.Op.M.A. v. Fischer Crane Co.*, 995 F.2d 789 (7th Cir. 1993); *Associates Discount Corp. v. Palmer*, 47 N.J. 183, 219 A.2d 858 (1966); *Massey-Ferguson Credit Corp. v. Casaulong*, 62 Cal. App. 3d 1024, 133 Cal. Rptr. 497 (1976); *Jack Heskett Lincoln-Mercury v. Metcalf*, 158 Cal. App. 3d 38; 204 Cal. Rptr. 355 (1984); *Worrel v. Farmers Bank of Delaware*, 430 A.2d 469 (Del. 1981); *Barnes v. Community Trust Bank*, 121 S.W.3d 520 (Ky. App. 2003); *First of Am. Bank v. Thompson,* 217 Mich. App. 581; 552 N.W.2d 516 (1996).

2.      Section 2-725 of the UCC, applicable to retail installment contracts, provides: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued...."  The Illinois citation is 810 ILCS 5/2-725.

3.      Section 2A-506 of the UCC, applicable to leases, provides: "An action for default under a lease contract, including breach of warranty or indemnity, must be commenced within 4 years after the cause of action accrued...."  The Illinois citation is 810 ILCS 5/2A-506.

4.      If the statute of limitations bars a claim by an assignor, it also bars a claim by a private (non-governmental) assignee.  *Greene v. Taylor,* 132 U.S. 415, 443 (1889).  "[T]he assignee *** takes the assignor's interest subject to all legal and equitable defenses existing at the time of the assignment." *John O. Schofield, Inc. v. Nikkel*, 314 Ill. App. 3d 771, 783, 731 N.E.2d 915 (5th Dist. 2000).  "[T]he assignee stands in the shoes of the assignor and, in so doing, is subject to any defense that might be urged against the assignor." *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App. 3d 610, 617, 518 N.E.2d 187 (1st Dist. 1987).  This includes the statute of limitations.  *Coryell v. Klehm*, 157 Ill. 462; 41 N.E. 864, 868-69 (1895).

5.      It is also well established that filing or threatening suits on time-barred debts is both unfair and deceptive, and violates the FDCPA, 15 U.S.C. §§1692e, 1692e(2), 1692e(5), 1692e(10)  and 1692f.  *Kimber v. Federal Financial Corp.*, 668 F.Supp. 1480

2

(M.D.Ala. 1987); *Baptist v. Global Holding & Inv. Co.*, 04-CV-2365 (DGT), 2007 U.S. Dist. LEXIS 49476 (E.D. N.Y., July 9, 2007); *Goins v. JBC & Assocs., P.C.*, 352 F. Supp. 2d 262, 272 (D. Conn. 2005); *Stepney v. Outsourcing Solutions*, 97 C 5288, 1997 U.S. Dist. LEXIS 18264, 1997 WL 722972, at *5 (N.D. Ill., Nov. 13, 1997).

## CLASS CERTIFICATION REQUIREMENTS

6.    All requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been met.

7.    The class is so numerous that joinder of all members is impractical.  It is reasonable to infer numerosity based on the following:

a.    According to Encore's 10-Q filed on August 4, 2005 its "[g]ross collections related to all portfolios of charged-off unsecured consumer loans, auto loan deficiencies and telecom receivables amount to $13.7 million and $8.1 million for the six months ended June 30, 2005 and 2004, respectively." (Appendix A, at original p. 15).

b.    According to Encore's 10-Q filed on May 4, 2004, "the Company resumed purchasing charged-off unsecured consumer loans and in 2002 began purchasing auto loan deficiencies. The Company purchased $8.9 million and $.5 million of these loans during the quarters ended March 31, 2004 and 2003, respectively.  Collections related to all portfolios of charged-off unsecured consumer loans and auto loan deficiencies amount to $3.1 million and $1.1 million for the quarters ended March 31, 2004 and 2003, respectively."  (Appendix B, at original p. 12).  In the same filing, Encore states that "[t]he source of the improvement was ... $1.9 million in collections from owned other consumer paper portfolios (charged-off unsecured consumer loans and auto loan deficiencies)...."  (Id. at original p. 35).

c.    In Encore's September 26, 2003 S-1/A filing, it states that it "purchased $0.4 million in auto loan deficiencies in December 2002."  (Appendix C, at original p. 44).

8.    Plaintiff will obtain the exact number of class members through discovery, and requests a briefing schedule long enough to obtain such information.

9.    There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  The predominant common question is whether the filing of time-barred lawsuits is an unfair or deceptive practice in violation of the FDCPA.

10.    The only individual issue is the identification of the class members, a matter capable of ministerial determination from defendants' records and court files.

11.    Plaintiff's claims are typical of those of the class members.  All are based on the same factual and legal theories.

12.    Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in bringing class actions and collection abuse claims. (Appendix D).  Plaintiff's counsel have sufficient resources to insure the vigorous prosecution of this action in the interests of the class members.

13.    A class action is superior for the fair and efficient adjudication of the class members' claims, in that:

a.    Congress specifically contemplated FDCPA class actions as a principal means of enforcing the statute;

b.    Consumers are unlikely to recognize the violation;

c.    The practice causes substantial injury to the public;

d.    A class action is necessary to determine that defendants' conduct is a violation of law and bring about its cessation.

14.    In further support of this motion, plaintiff submits the accompanying memorandum of law.

15.    Plaintiff is filing this motion at this early time because of the decision in *White v. Humana Health Plan, Inc.*, 06 C 5546, 2007 U.S.Dist. LEXIS 32263 (N.D.Ill., May 2, 2007).

WHEREFORE, plaintiff respectfully requests that this Court enter an order

determining that this action may proceed as a class action.

Respectfully submitted,

s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## <u>CERTIFICATE OF SERVICE</u>

   I, Daniel A. Edelman, hereby certify that on May 12, 2008, the foregoing document was filed electronically using the Court's CM/ECF system.  A copy of the foregoing document was served via Certified Mail on the following:

MIDLAND CREDIT MANAGEMENT, INC.
c/o Illinois Corporation Service Co., Registered Agent
801 Adlai Stevenson Drive
Springfield, IL 62703

MIDLAND FUNDING NCC-2 CORPORATION
c/o Corporation Service Company, Registered Agent
2711 Centerville Road
Suite 400
Wilmington, DE  19808

ENCORE CAPITAL GROUP, INC.
c/o 8875 Aero Drive
Suite 200
San Diego, CA 92123

         <u>s/ Daniel A. Edelman</u>
         Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

# EXHIBIT A

10-Q 1 form10q_2nd2005.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

#### (Mark One)

[X]  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2005

OR

[  ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____.

COMMISSION FILE NUMBER: 000-26489

# ENCORE CAPITAL GROUP, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **48-1090909** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **8875 Aero Drive, Suite 200** | |
| **San Diego, California** | **92123** |
| (Address of principal executive offices) | (Zip code) |

**(877) 445 – 4581**
(Registrant's telephone number, including area code)

**(Not Applicable)**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the last 90 days.

Yes [X] No [  ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act)

Yes [X] No [  ]

Indicate the number of shares outstanding of each of the issuer's classes of stock, as of the latest practicable date.

| **Class** | **Outstanding at July 20, 2005** |
|---|---|
| Common Stock, $0.01 par value | 22,328,507 shares |

## ENCORE CAPITAL GROUP, INC.
### INDEX TO FORM 10-Q

|  | Page |
|---|---|
| PART I - FINANCIAL INFORMATION | |
| Item 1 - Consolidated Financial Statements | 2 |
| Unaudited Condensed Consolidated Statements of Financial Condition | 2 |
| Unaudited Condensed Consolidated Statements of Operations | 3 |
| Unaudited Condensed Consolidated Statement of Stockholders' Equity | 4 |
| Unaudited Condensed Consolidated Statements of Cash Flows | 5 |
| Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Supplemental Performance Data | 30 |
| Item 3 - Quantitative and Qualitative Disclosures about Market Risk | 42 |
| Item 4 - Controls and Procedures | 42 |
| PART II - OTHER INFORMATION | 43 |
| Item 1 - Legal Proceedings | 45 |
| Item 4 - Submission of Matters to a Vote of Securities Holders | 46 |
| Item 6 - Exhibits | 47 |
| SIGNATURES | 48 |
| Certificate of Principal Executive Officer | 49 |
| Certificate of Principal Financial Officer | 50 |
| Certificate of the Principal Executive and Financial Officers pursuant to Section 906 of the SARBANES-OXLEY ACT of 2002 | 51 |

1

Index

## PART I. FINANCIAL INFORMATION
### Item 1. Consolidated Financial Statements

### ENCORE CAPITAL GROUP, INC.
#### Condensed Consolidated Statements of Financial Condition
#### (In Thousands, Except Par Value Amounts)

|  | June 30, 2005 (Unaudited) | December 31, 2004 (A) |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 18,949 | $ 9,731 |
| Investments in marketable securities | - | 40,000 |
| Restricted cash | 2,930 | 3,432 |
| Investment in receivable portfolios, net | 246,070 | 137,963 |
| Property and equipment, net of accumulated depreciation of $9,789 and $12,097, respectively | 3,483 | 3,360 |
| Deferred tax assets, net | 2,470 | 361 |
| Forward flow asset | 42,152 | - |
| Other assets | 8,850 | 6,295 |
| Goodwill | 5,000 | - |
| **Total assets** | $ 329,904 | $ 201,142 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Accounts payable and accrued liabilities | $ 17,540 | $ 17,418 |

In connection with the Company's management succession plan, which is described under the heading "Executive Officers and Compensation," in the Company's proxy statement filed on April 5, 2005, the vesting provisions of option grants on September 11, 2002 to three executive officers have been revised by the Compensation Committee of the Company's Board of Directors. Under the revised vesting dates, 50% of the options to purchase 208,333 shares at an exercise price of $0.51 per share granted to each of two of the executive officers vested on May 3, 2005, and the remaining 50% will vest no later than May 3, 2006. One of these officers retired on May 3, 2005, but was elected as a director of the Company at the Company's annual meeting on the same date. One-third of the option to purchase 208,333 shares granted at an exercise price of $0.51 per share to the other executive officer vested on May 3, 2005; an additional one-third will vest no later than May 3, 2006; and the final one-third will vest no later than September 11, 2007. Under the revised vesting provisions, vesting may be accelerated upon the occurrence of an equity event as specified in the respective option agreements. As of June 30, 2005, approximately 228,000 of these options were vested and exercisable. The Compensation Committee of the Company's Board of Directors reviewed the succession plan and the new vesting provisions of the option grants and determined that the changes associated with these options are not considered a modification that renews or increases the life of the option grant and thus does not result in a new measurement of compensation cost.

Until January 1, 2006, the Company will continue to account for all of its stock options in accordance with APB No. 25 with appropriate disclosure of pro forma net income and earnings per share determined as if the fair value based method had been applied in measuring compensation cost. The Company expects to adopt the provisions of SFAS No. 123R upon its required implementation date of January 1, 2006. The adoption of SFAS 123R, will result in the recording of compensation expense in the Company's consolidated statement of operations for the unvested option grants based on the fair value of the respective options at the date of grant.

12

**Note 5: Investment in Receivable Portfolios, Net**

Prior to January 1, 2005, the Company accounted for its investment in receivable portfolios utilizing the interest method under the provisions of the AICPA's Practice Bulletin 6, "*Amortization of Discounts on Certain Acquired Loans.*" Commencing January 1, 2005, the Company began accounting for its investment in receivable portfolios utilizing the interest method in accordance with the provisions of SOP 03-03. SOP 03-03 addresses accounting for differences between initial estimated cash flows expected to be collected from purchased receivables, or "pools," and subsequent changes to those estimated cash flows. SOP 03-03 limits the revenue that may be accreted, (also known as accretable yield), to the excess of the Company's estimate of undiscounted cash flows expected to be collected over the Company's investment, or cost basis, in the pool. The effective interest rate applied to the cost basis of the pool would remain level, or "static" throughout its life unless there was an increase in subsequent expected cash flows. Subsequent increases in cash flows expected to be collected generally would be recognized prospectively through an upward adjustment of the pool's effective interest rate over its remaining life. Subsequent decreases in expected cash flows would not change the effective interest rate, but would be recognized as an impairment of the cost basis of the pool, and would appear in the consolidated statement of operations with a corresponding valuation allowance offsetting the investment in receivable portfolios in the consolidated statement of financial condition. No provision for impairment losses was recorded during the six months ended June 2005 and 2004.

In accordance with SOP 03-03, static pools are established on a quarterly basis with accounts purchased during the quarter that have common risk characteristics. Discrete receivable portfolio purchases during a quarter are aggregated into pools based on these common risk characteristics. Once a static pool is established, the portfolios are permanently assigned to the pool. The discount (i.e., the difference between the cost of each static pool and the related aggregate contractual receivable balance) is not recorded because the Company expects to collect a relatively small percentage of each static pool's contractual receivable balance. As a result, receivable portfolios are recorded at cost at the time of acquisition. Upon adoption of SOP 03-03, all portfolios with common risk characteristics purchased prior to the adoption of SOP 03-03 were aggregated by quarter of purchase.

The Company accounts for each static pool as a unit for the economic life of the pool (similar to one loan) for recognition of revenue from receivable portfolios, for collections applied to the cost basis of receivable portfolios and for provision for loss or impairment. Revenue from receivable portfolios is accrued based on each pool's effective interest rate applied to each pool's adjusted cost basis. The cost basis of each pool is increased by revenue earned and decreased by gross collections and impairments. The effective interest rate is the internal rate of return derived from the timing and amounts of actual cash received and anticipated future cash flow projections for each pool.

13

Accretable yield represents the amount of revenue the Company expects to generate over the remaining life of its existing investment in receivable portfolios based on estimated future cash flows. The following table summarizes the Company's accretable yield and an estimate of

zero basis future cash flows at the beginning and end of the current period *(in thousands)*:

| | Estimate of Zero Basis Cash Flows | | Accretable Yield | | Total |
|---|---|---|---|---|---|
| | | | **Six Months Ended June 30, 2005** | | |
| Beginning balance at December 31, 2004 | $ 72,740 | $ | 263,139 | $ | 335,879 |
| Revenue recognized | (10,360) | | (40,060) | | (50,420) |
| Additions | 11,432 | | 26,162 | | 37,594 |
| Additions for current purchases | - | | 22,450 | | 22,450 |
| Balance at March 31, 2005 | 73,812 | | 271,691 | | 345,503 |
| Revenue recognized | (9,230) | | (44,289) | | (53,519) |
| Additions | 1,694 | | 10,130 | | 11,824 |
| Additions for current purchases | - | | 141,611 | | 141,611 |
| Ending balance at June 30, 2005 | $ 66,276 | $ | 379,143 | $ | 445,419 |

During the three months ended June 30, 2005, the Company purchased receivable portfolios with a face value of $3.7 billion for $121.0 million, or a purchase cost of 3.29% of face value. The estimated collections at acquisition for these portfolios amounted to $262.6 million. During the six months ended June 30, 2005, the Company purchased receivable portfolios with a face value of $4.2 billion for $140.6 million, or a purchase cost of 3.34% of face value. The estimated collections at acquisition for these portfolios amounted to $306.4 million.

Collections realized after the cost basis value of a portfolio has been fully recovered ("Zero Basis Portfolios") are recorded as revenue ("Zero Basis Revenue"). During the three months ended June 30, 2005 and 2004, approximately $9.2 million and $11.9 million, respectively, was recognized as revenue on portfolios for which the related cost basis has been fully recovered. During the six months ended June 30, 2005 and 2004, approximately $19.6 million and $24.2 million, respectively, was recognized as revenue on portfolios for which the related cost basis has been fully recovered.

If the amount and timing of future cash collections on a pool of receivable portfolios are not reasonably estimable, the Company accounts for such portfolios on the cost recovery method ("Cost Recovery Portfolios"). No revenue is accreted on Cost Recovery Portfolios. All collections are applied 100% to recover the remaining cost basis of the portfolio and thereafter are recognized as revenue. At June 30, 2005, one portfolio with a book value of $2.5 million was accounted for using the cost recovery method. This portfolio was acquired in connection with the Jefferson Capital acquisition (Note 3) and consisted primarily of bankrupt and deceased accounts. These accounts have different risk characteristics than the other portfolios acquired during the quarter and accordingly were aggregated into a separate pool. The Company has preliminarily allocated $2.5 million of the Jefferson Capital purchase price to this portfolio, which is subject to revision pending the final purchase price allocation.

14

The following table summarizes the changes in the balance of the investment in receivable portfolios during the six months ended June 30, 2005 *(in thousands, except percentages)*:

| | Accrual Basis Portfolios | | Cost Recovery Portfolios | | Zero Basis Portfolios | | Total |
|---|---|---|---|---|---|---|---|
| | | | **For the Six Months Ended June 30, 2005** | | | | |
| Balance, beginning of period | $ 137,553 | $ | 410 | $ | - | $ | 137,963 |
| Purchases of receivable portfolios | 138,024 | | 2,546 | | | | 140,570 |
| Transfers of portfolios | 404 | | (404) | | - | | - |
| Gross collections[1] | (116,061) | | (13) | | (18,619) | | (134,693) |
| Basis adjustments | (738) | | - | | (1) | | (739) |
| Revenue recognized[1] | 84,349 | | - | | 18,620 | | 102,969 |
| Balance, end of period | $ 243,531 | $ | 2,539 | $ | - | $ | 246,070 |
| Revenue as a percentage of collections | 72.7% | | 0.0% | | 100.0% | | 76.4% |

[1] Gross collections and revenue related to the retained interest are not included in these tables. Zero basis collections and revenue related to the retained interest (the cost basis for which was fully amortized in the second quarter of 2004) was $1.0 million during the six months ended June 30, 2005.

The Company historically has purchased portfolios of charged-off unsecured consumer credit cards and relatively few portfolios of charged-off unsecured consumer loans. During 2001, the Company resumed purchasing charged-off unsecured consumer loans, in 2002 it began purchasing auto loan deficiencies, and in 2004 it began purchasing charged-off consumer telecom receivables. The Company spent $3.5 million to purchase non-credit card loans for the three months ended June 30, 2005 and $6.2 million during the three months ended June 30, 2004. Gross collections related to all portfolios of charged-off unsecured consumer loans, auto loan deficiencies and telecom receivables amounted to $7.0 million for the three months ended June 30, 2005 and $5.0 million for the three months ended June 30, 2004. The Company spent $3.5 million to purchase non-credit card loans during the six months ended June 30, 2005, and $15.1 million for the six months ended June 30, 2004. Gross collections related to all portfolios of charged-off unsecured consumer loans, auto loan deficiencies and telecom receivables amounted to $13.7 million and $8.1 million for the six months ended June 30, 2005 and 2004, respectively.

The Company utilizes various business channels for the collection of its receivables. The following table summarizes collections by collection channel *(in thousands)*:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Collection sites | $ 31,764 | $ 31,959 | $ 66,806 | $ 67,247 |
| Legal collections | 22,622 | 17,397 | 43,819 | 31,553 |
| Collection agencies | 8,159 | 2,636 | 13,687 | 4,700 |
| Sales | 7,359 | 4,611 | 10,656 | 13,617 |
| Other | 503 | 799 | 1,292 | 4,280 |
| Gross collections for the period | $ 70,407 | $ 57,402 | $ 136,260 | $ 121,397 |

During the first quarter of 2004, the Company discontinued its rewrite program and sold its portfolio of rewritten notes. The Company's rewrite program offered debtors the ability to settle their obligation by paying a certain percentage of the amount due and executing a new "rewritten" note for the remaining negotiated balance. The notes, which were related to accounts throughout the Company's portfolios, were sold for $4.0 million. The cash proceeds of $2.9 million from accruing portfolios and $1.1 million from zero basis portfolios were treated as additional portfolio collections for revenue recognition purposes. This is consistent with the Company's historical accounting for collections from the rewritten notes.

## Note 6: Notes Payable and Other Borrowings

The Company is obligated under borrowings as follows *(in thousands)*:

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Revolving Credit Facility | $ 143,715 | $ 9,829 |
| Secured Financing Facility | 36,096 | 56,599 |
| Secured Note | 96 | 139 |
| | $ 179,907 | $ 66,567 |

*Revolving Credit Facility*
On June 30, 2004, the Company entered into a $75.0 million, three-year revolving credit facility to be utilized for the purposes of purchasing receivable portfolios and for working capital needs. On June 7, 2005, the Company replaced the $75.0 million revolving credit facility with a new $150.0 million revolving facility (the "Revolving Credit Facility") from the same financial institution. Proceeds from this new facility were used to finance the acquisition of assets from Jefferson Capital and will be utilized for the purpose of purchasing receivable portfolios and for working capital needs. See Note 3 for a further discussion of the acquisition of assets from Jefferson Capital. Effective August 1, 2005, the Company amended the Revolving Credit Facility as described in Note 10.

The new credit facility has a maturity date of June 7, 2008 and bears interest at a floating rate equal to, at the Company's option, either: (a) reserve adjusted LIBOR plus a spread that ranges from 200 to 325 basis points, depending on the Company's leverage; or (b) the higher of (1) the federal funds rate then in effect plus a spread of 50 basis points and (2) the prime rate then in effect plus a spread that ranges from 0 to 50 basis points. The applicable margin will be adjusted quarterly based on a pricing grid that takes into account certain financial covenants related to the Company's consolidated statement of financial condition and results of operations. At June 30, 2005 amounts outstanding under the credit facility bore interest at 6.5%. The new credit facility is secured by all assets of the Company, except for the assets of the Company's

wholly-owned subsidiary, MRC Receivables Corporation, in which the Company's former secured lender has a first priority security interest. The new facility also requires the Company to pay certain fees and expenses to the lender in connection with the related commitment letter and the credit facility.

16

The new credit facility provides for an aggregate revolving commitment of $150.0 million, subject to borrowing base availability, with $5 million sub-limits for swingline loans and letters of credit. The Revolving Credit Facility borrowing base provides for an 85.0% initial advance rate for the purchase of qualified receivable portfolios. The borrowing base reduces for each qualifying portfolio by (i) the purchase price multiplied by (ii) 85% less 3% per month beginning after the third complete month subsequent to purchase. The aggregate borrowing base is equal to the lesser of (a) the sum of all of the borrowing bases of all qualified receivable portfolios under this facility, as defined above, and (b) 95% of the net book value of all receivable portfolios acquired on or after January 1, 2005. The Company may request an increase in the amount of the revolving credit commitments to $200.0 million upon satisfying certain conditions, including acceptance of such increase by existing or replacement lenders under the facility that agree to increase their commitments. This financing arrangement does not require the Company to share residual collections with the lender and may be pre-paid in full without penalty.

The terms of the credit facility include restrictions and covenants, which limit, among other things, the payment of dividends and the incurrence of additional indebtedness and liens. The terms also require compliance with financial covenants requiring maintenance of specified ratios of EBITDA to liabilities, tangible net worth to liabilities and EBIT to interest expense. Subject to certain exceptions, the dividend restriction referred to above generally provides that the Company will not, during any fiscal year, make distributions with respect to common stock or other equity interests in an aggregate amount in excess of 20% of consolidated net income for such period.

The credit agreement specifies a number of events of default (some of which are subject to applicable cure periods), including, among others, the failure to make payments when due, noncompliance with covenants, and defaults under other agreements or instruments of indebtedness. Upon the occurrence of an event of default, the lenders may terminate the senior credit facility and declare all amounts outstanding to be immediately due and payable.

In conjunction with establishing this new credit facility, the Company incurred loan fees and other loan costs amounting to $2.1 million. These costs, together with $0.4 million of unamortized loan fees and loan costs associated with the previous facility will be amortized over the term of the new agreement.

### *Secured Financing Facility*
On December 31, 2004, the Company's $75.0 million secured financing facility (the "Secured Financing Facility") expired. The Secured Financing Facility was entered into on December 20, 2000 by MRC Receivables Corporation, a wholly owned bankruptcy-remote, special-purpose entity, to finance the purchase of receivable portfolios. The facility generally provided for a 90.0% advance rate with respect to each qualified receivable portfolio purchased. Interest accrues at the prime rate plus 3.0% per annum and is payable weekly. The interest rate reduces by 1.0% on outstanding amounts in excess of $25.0 million. Amounts outstanding under the Secured Financing Facility bore interest at rates ranging from 8.25% to 9.25% at June 30, 2005. Notes issued under the facility are collateralized by the charged-off receivables that are purchased with the proceeds from this financing arrangement. Each note has a maturity date not to exceed 27 months after the borrowing date. Once the notes are repaid and the Company has recouped its investment, the Company and the lender share the residual collections from the receivable portfolios, net of servicing fees. The sharing in residual collections continues for the entire economic life of the receivable portfolios financed using this facility, and therefore will extend substantially beyond the December 31, 2004 expiration date of the Secured Financing Facility. The Company was required to give the lender the opportunity to fund all of its purchases of charged-off credit card receivables with advances on the Secured Financing Facility through December 31, 2004. Most purchases during the fourth quarter of 2004 were financed under an amendment to the Secured Financing Facility that provides for a cap, as defined, on the total amount of interest owed to the lender for such borrowings.

17

The following table summarizes interest expense associated with the Secured Financing Facility for the periods presented *(in thousands)*:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| Stated interest | $ 876 | $ 511 | $ 1,900 | $ 1,098 |
| Contingent interest | 6,689 | 8,417 | 13,572 | 17,049 |

# EXHIBIT B

10-Q 1 form10q_033104.htm 1ST QUARTER 10Q-MARCH 31, 2004

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-Q

(Mark One)

[X]    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

**For the quarterly period ended March 31, 2004**

**OR**

[  ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from _____ to _____.

**COMMISSION FILE NUMBER: 000-26489**

# ENCORE CAPITAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** (State or other jurisdiction of incorporation or organization) | **48-1090909** (IRS Employer Identification No.) |
| **5775 Roscoe Court** **San Diego, California** (Address of principal executive offices) | **92123** (Zip code) |

**(877) 445 — 4581**
(Registrant's telephone number, including area code)

**(Not Applicable)**
(Former name, former address and former fiscal year, if changed since last report)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the last 90 days.        Yes [X] No [  ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act)
        Yes [  ] No [X]

Indicate the number of shares outstanding of each of the issuer's classes of stock, as of the latest practicable date.

| Class | Outstanding at April 15, 2004 |
|---|---|
| Common Stock, $0.01 par value | 22,046,579 shares |

# ENCORE CAPITAL GROUP, INC.
## INDEX TO FORM 10-Q

| | Page |
|---|---|
| PART I –FINANCIAL INFORMATION | 2 |
| Item 1 - Consolidated Financial Statements | 2 |
| Unaudited Condensed Consolidated Statements of Financial Condition | 2 |
| Unaudited Condensed Consolidated Statements of Operations | 3 |
| Unaudited Condensed Consolidated Statement of Stockholders' Equity | 4 |
| Unaudited Condensed Consolidated Statements of Cash Flows | 5 |
| Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| Item 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3 - Quantitative and Qualitative Disclosures about Market Risk | 41 |
| Item 4 - Controls and Procedures | 41 |
| PART II - OTHER INFORMATION | 42 |
| Item 1 - Legal Proceedings | 44 |
| Item 6 - Exhibits and Reports on Form 8-K | 45 |
| SIGNATURES | 46 |
| Certificate of Principal Executive Officer | 47 |
| Certificate of Principal Financial Officer | 48 |

1

Index to Form 10Q

**PART I. FINANCIAL INFORMATION**
**Item 1. Financial Statements**

# ENCORE CAPITAL GROUP, INC.
## Condensed Consolidated Statements of Financial Condition
### (In Thousands, Except Par Value Amounts)

| | | March 31, 2004 (Unaudited) | | December 31, 2003 (A) |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ | 36,803 | $ | 38,612 |
| Restricted cash | | 5,367 | | 842 |
| Investment in receivable portfolios, net *(Notes 4, 5 and 7)* | | 86,208 | | 89,136 |
| Investment in retained interest *(Note 5)* | | 72 | | 1,231 |
| Property and equipment, net *(Note 6)* | | 2,844 | | 2,786 |
| Deferred tax assets, net *(Note 8)* | | 5,089 | | 1,358 |
| Other assets | | 4,527 | | 4,320 |
| Total assets | $ | 140,910 | $ | 138,285 |
| **Liabilities and stockholders' equity** | | | | |
| Liabilities | | | | |
| Accounts payable and accrued liabilities | $ | 12,735 | $ | 11,644 |
| Accrued profit sharing arrangement *(Note 7)* | | 15,586 | | 12,749 |
| Income tax payable *(Note 8)* | | 6,849 | | 883 |
| Notes payable and other borrowings *(Note 7)* | | 27,656 | | 41,178 |

connection with the lawsuit filed against MBNA in February 2001. Pursuant to the terms of the settlement (the "Litigation Settlement"), MBNA paid Midland Credit $11.1 million on April 4, 2003 in full and complete satisfaction of the claims. The net proceeds of $7.9 million, which is net of litigation expenses and attorneys' fees, were used to repay holders of the Warehouse Facility and Securitization 99-1 (see Notes 5 and 7).

9

During the first quarter of 2003, the Company recorded a net gain of $7.2 million, which was comprised of the net proceeds of $7.9 million, reduced by the remaining carrying value of the related receivable portfolios as of March 31, 2003, which was $0.7 million.

**Note 4: Investment in Receivable Portfolios, Net**

The Company accounts for its investment in receivables portfolios on the "accrual basis" or "cost recovery method" of accounting in accordance with the provisions of the AICPA's Practice Bulletin 6, *"Amortization of Discounts on Certain Acquired Loans."* Static pools are established with accounts having similar attributes, based on the specific seller and timing of acquisition. Once a static pool is established, the receivables are permanently assigned to the pool. The discount (i.e., the difference between the cost of each static pool and the related aggregate contractual receivable balance) is not recorded because the Company expects to collect a relatively small percentage of each static pool's contractual receivable balance. As a result, receivables portfolios are recorded at cost at the time of acquisition.

The Company accounts for each static pool as a unit for the economic life of the pool (similar to one loan) for recognition of revenue from receivables portfolios, for collections applied to principal of receivables portfolios and for provision for loss or impairment. Revenue from receivables portfolios is accrued based on the effective interest rate determined for each pool applied to each pool's adjusted cost basis. Each pool's cost basis is increased for revenue earned and decreased for principal pay downs and impairments. The effective interest rate is the internal rate of return determined based on the timing and amounts of actual cash received and anticipated future cash flow projections for each pool.

The Company monitors and evaluates actual and projected cash flows for each receivable portfolio on a quarterly basis. Through September 30, 2003, the Company had not increased the total estimated cash flows for any receivable portfolio. As a result, for those portfolios whose actual cumulative collections exceeded the forecast, such excess amounts were subtracted from the future estimated collections in order to maintain the original forecast. The Company has, on the other hand, reduced the total estimated cash flows on certain receivable portfolios where actual cumulative collections to date have not met the forecast. If the remaining forecasted cash flows are in excess of the remaining carrying value, the effective interest is reduced prospectively. If the remaining forecasted cash flows are less than the remaining carrying value, the receivable portfolio is impaired and all of the remaining collections are subsequently applied against book value. Additionally, if the amount and timing of future cash collections are not reasonably estimable, the Company accounts for these portfolios on the cost recovery method ("Cost Recovery Portfolios"). No revenue is accreted on Cost Recovery Portfolios. All collections are applied 100% to recover the remaining cost basis of the portfolio and thereafter are recognized as revenue. At March 31, 2004, five portfolios with a remaining carrying value of $1.2 million were accounted for using the cost recovery method by the Company. No provision for impairment losses was recorded during the quarters ended March 31, 2004 and 2003.

10

On purchases made since mid-2000, the Company's gross collections, in the aggregate, have exceeded expectations. The Company has developed the statistical support to help it determine whether the better than expected performance resulted from: (i) the Company collecting at a more rapid rate than originally forecast; (ii) the Company increasing its penetration of the portfolio and thus increasing the likelihood of collecting more than the original forecast; or (iii) some combination of both faster collections and additional penetration of the portfolio. Effective October 1, 2003, the Company implemented its recently developed Unified Collection Score ("UCS") model to project these remaining cash flows, considering known data about the Company's customers' accounts, including, among other things, the Company's

collection experience, and changes in external customer factors, in addition to all data known when it acquired the accounts.

Effective January 1, 2004, the Company implemented three additional statistical enhancements in the UCS model. The Company revised the projected collections for 80 portfolios with carrying values totaling $62.3 million as of January 1, 2004, which represented 69.9% of the aggregate carrying value of its portfolios at that date. The change in the estimate of projected collections resulting from the application of the UCS model resulted in an increase in the aggregate total remaining gross collections for these portfolios by 46.4% as of March 31, 2004. The implementation of these revised forecasts resulted in an increase in the recognition of accretion revenue of $5.3 million and an increase in the accrual for contingent interest of $1.8 million for the first quarter of 2004. The net impact of the change in estimate was to increase first quarter pretax income by $3.5 million, net income by $2.1 million and fully diluted earnings per share by $0.09. The reforecast of collections resulted in expanding the budget life of these portfolios by an average of 6 months from an average remaining life of 36 months to a revised average remaining life of 42 months. The resulting ratio of revenues to collections for accruing portfolios for the quarter ended March 31, 2004 increased 10.8% to 60.8% as a result of this adjustment.

Collections realized after the net book value of a portfolio has been fully recovered ("Zero Basis Portfolios") are recorded as revenue ("Zero Basis Income"). During the quarters ended March 31, 2004 and 2003, approximately $12.3 million and $2.6 million, respectively, was recognized as revenue pertaining to collections on portfolios for which the related net book value has been fully recovered.

11

The following tables summarize the changes in the balance of the investment in receivable portfolios during the following periods *(in thousands)*:

| | For the Three Months Ended March 31, 2004 | | | |
|---|---|---|---|---|
| | Accrual Basis Portfolios | Cost Recovery Portfolios | Zero Basis Portfolios | Total |
| Balance, beginning of period | $  87,249 | $  1,887 | $  — | $  89,136 |
| Purchases of receivable portfolios | 17,248 | | | 17,248 |
| Transfers of portfolios | — | | | — |
| Gross collections | (49,020) | (625) | (12,250) | (61,895) |
| Adjustments | (322) | (15) | (19) | (356) |
| Revenue recognized | 29,806 | | 12,269 | 42,075 |
| Balance, end of period | $  84,961 | $  1,247 | $  — | $  86,208 |
| Revenue as a percentage of collections | 60.8% | 0.0% | 100.0% | 68.0% |

| | For the Three Months Ended March 31, 2003 | | | |
|---|---|---|---|---|
| | Accrual Basis Portfolios | Cost Recovery Portfolios | Zero Basis Portfolios | Total |
| Balance, beginning of period | $  63,253 | $  915 | $  — | $  64,168 |
| Purchases of receivable portfolios | 18,803 | | | 18,803 |
| Transfers of portfolios | (1,140) | 1,140 | | — |
| Gross collections | (39,207) | (630) | (2,552) | (42,389) |
| Portion of Litigation Settlement proceeds applied to carrying value | (692) | — | — | (692) |
| Adjustments | (252) | 1 | (4) | (255) |
| Revenue recognized | 24,700 | — | 2,556 | 27,256 |
| Balance, end of period | $  65,465 | $  1,426 | $  — | $  66,891 |

| | | | | |
|---|---|---|---|---|
| Revenue as a percentage of collections | 63.0% | 0.0% | 100.0% | 64.3% |

The annualized weighted average effective interest rate for receivable portfolios on the accretion method was 146.9% for the quarter ended March 31, 2004, compared to 162.6% for the quarter ended March 31, 2003.

During 2001, the Company resumed purchasing charged-off unsecured consumer loans and in 2002 began purchasing auto loan deficiencies. The Company purchased $8.9 million and $0.5 million of these loans during the quarters ended March 31, 2004 and 2003, respectively. Collections related to all portfolios of charged-off unsecured consumer loans and auto loan deficiencies amounted to $3.1 million and $1.1 million for the quarters ended March 31, 2004 and 2003, respectively.

12

The Company currently utilizes various business channels for the collection of charged-off credit cards and other receivables. The following table summarizes the collections by collection channel *(in thousands)*:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2004 | 2003 |
| Collection sites | $ 35,288 | $ 31,307 |
| Legal collections | 14,156 | 8,836 |
| Sales | 9,007 | 5,711 |
| Other | 5,545 | 1,229 |
| Gross collections for the period | $ 63,996 | $ 47,083 |

During the first quarter of 2004, the Company discontinued its rewrite business, released or reassigned the eight employees involved in the processing of rewrites, and sold the portfolio of rewritten notes. The notes, which were related to accounts throughout the Company's portfolios, were sold for $4.0 million. The cash proceeds of $2.9 million from accruing portfolios and $1.1 million from zero basis portfolios were treated as additional portfolio collections for revenue recognition purposes. This is consistent with the Company's historical accounting for collections from the rewrite notes.

**Note 5: Securitization of Receivable Portfolios**

*1999 Warehouse and 1999 Securitization Financing*
In March of 1999, and January of 2000, the Company entered into two securitized receivable acquisition facilities through two bankruptcy remote, special purpose subsidiaries, Midland Funding 98-A Corporation and Midland Receivables 99-1 Corporation, respectively. Midland Funding 98-A Corporation entered into a $35.0 million facility (the "Warehouse Facility"), structured as a term loan bearing interest at 1.17% plus the one-week London Interbank Offered Rate ("LIBOR"). Midland Receivables 99-1 Corporation issued securitized non-recourse notes in the amount of $28.9 million ("Securitization 99-1"), bearing interest at 10% per annum. The Warehouse Facility and Securitization 99-1 were collateralized and cross-collateralized by certain charged-off receivables and were insured through a financial guaranty insurance policy.

On April 15, 2003, all obligations related to the Warehouse Facility and Securitization 99-1 were repaid in full. This included payment of the debt balances of $5.0 million and $4.6 million for the Warehouse Facility and Securitization 99-1, respectively, and the combined deferred insurance premiums of $1.9 million. The funds to repay these liabilities came from the Litigation Settlement (see Note 3), funds held in related reserve accounts and other internal cash sources. Since the payment in full of all obligations related to the Warehouse Facility and Securitization 99-1, the Company now receives 100% of future collections from the related portfolios.

13

*1998 Securitization/Sale*

On September 11, 2000, Midland Receivables 98-1 Corporation, a bankruptcy-remote, special-purpose subsidiary of Midland Credit, repaid non-recourse notes originally issued in the principal amount of $33.0 million in 1998. In connection with this securitization transaction, the Company recorded a retained interest in securitized receivables. The retained interest was originally recorded at fair value, with the difference between fair value and cost basis recorded as unrealized gain and included in accumulated other comprehensive income as a component of stockholders' equity. In accordance with Emerging Issues Task Force Consensus No. 99-20, *"Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets,"* the retained interest is carried at cost, is increased by interest accretion based on estimated future cash receipts, is decreased by actual cash collections, and the unrealized gain is amortized using an effective interest method.

Once each quarter, the Company monitors the retained interest for impairment based on discounted anticipated future cash flows of the underlying receivables as compared to the current carrying value (original cost basis adjusted for interest earned and principal pay downs) of the retained interest. During the first quarter of 2003, the Company lowered its expected yield on the retained interest from an annual return of approximately 44.4% to 7.5% based on estimated net cash flows derived from both historical and projected collections. The revenue recognized on the retained interest was $16 thousand and $128 thousand for the quarters ended March 31, 2004 and 2003, respectively. During April 2004, collections exceeded the remaining book value of $72 thousand for the investment in retained interest and future collections, if any, will be recognized as revenue.

Provisions for losses would be charged to earnings when it is determined that the retained interest's carrying value is greater than the present value of expected future cash flows. No provision for impairment has ever been recorded for the retained interest.

The following summarizes the changes in the balance of the investment in retained interest *(in thousands)*:

| | For the Three Months Ended March 31, 2004 | | |
| --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Carrying Value |
| Balance at December 31, 2003 | $ 1,195 | $ 36 | $ 1,231 |
| Revenue recognized | 16 | – | 16 |
| Gross collections | (1,139) | – | (1,139) |
| Amortization of unrealized gain | – | (36) | (36) |
| Balance at March 31, 2004 | $ 72 | $ – | $ 72 |

14

| | For the Three Months Ended March 31, 2003 | | |
| --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Carrying Value |
| Balance at December 31, 2002 | $ 7,707 | $ 549 | $ 8,256 |
| Revenue recognized | 128 | – | 128 |
| Gross collections | (2,726) | – | (2,726) |
| Amortization of unrealized gain | – | (212) | (212) |
| Balance at March 31, 2003 | $ 5,109 | $ 337 | $ 5,446 |

**Note 6: Property and Equipment**

# EXHIBIT C

**Table of Contents**

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON SEPTEMBER 26, 2003
REGISTRATION NO. 333-108423

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

Pre-Effective Amendment No. 1 to

# Form S-1
## REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# Encore Capital Group, Inc.

*(Exact name of registrant as specified in its charter)*

| Delaware | 6153 | 48-1090909 |
|----------|------|------------|
| *(State of Incorporation)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No.)* |

5775 Roscoe Court
San Diego, California 92123
(877) 445-4581

*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

Carl C. Gregory, III
President and Chief Executive Officer
Encore Capital Group, Inc.
5775 Roscoe Court
San Diego, California 92123
(877) 445-4581

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

| Steven D. Pidgeon | Robin R. Pruitt | Charles K. Ruck |
|-------------------|-----------------|-----------------|
| Snell & Wilmer L.L.P. | Encore Capital Group, Inc. | R. Scott Shean |
| One Arizona Center | 5775 Roscoe Court | Latham & Watkins LLP |
| Phoenix, Arizona 85004 | San Diego, California 92123 | 650 Town Center Drive, 20th Floor |
| (602) 382-6000 | (877) 445-4581 | Costa Mesa, California 92626 |
| | | (714) 540-1235 |

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Prospectus Summary | 1 |
| The Offering | 5 |
| Summary Consolidated Financial Data | 6 |
| Risk Factors | 8 |
| Special Note on Forward-Looking Statements | 16 |
| Use of Proceeds | 17 |
| Price Range of Common Stock | 18 |
| Dividend Policy | 19 |
| Capitalization | 20 |
| Selected Financial Data | 21 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 48 |
| Management | 61 |
| Executive Compensation | 66 |
| Related Party Transactions | 69 |
| Selling and Principal Stockholders | 71 |
| Description of Capital Stock | 76 |
| Shares Eligible for Future Sale | 78 |
| Underwriting | 80 |
| Legal Matters | 82 |
| Experts | 82 |
| Change in Independent Auditors | 82 |
| Where You Can Find More Information | 82 |
| Index To Consolidated Financial Statements | F-1 |

You should rely only on the information contained in this prospectus. We have not, and the selling stockholders and the underwriters have not, authorized any other person to provide you with different information. This prospectus is not an offer to sell, nor is it seeking an offer to buy, these securities in any state where the offer or sale is not permitted. The information contained in this prospectus is complete and accurate as of the date on the front cover, but the information may have changed since that date.

i

**Table of Contents**

The following table summarizes the concentration of our purchases by seller by year for the following periods adjusted for put-backs, account recalls and replacements, purchase price rescissions, and the impact of an acquisition in 2000 *(in thousands)*:

**Concentration of Initial Purchase Cost by Seller**

|  | 2000 | | 2001 | | 2002 | | Six Months — 2003 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Cost | % | Cost | % | Cost | % | Cost | % | Cost | % |
| Seller 1 | — | — | $13,222 | 33.9% | $20,223 | 32.3% | $ 14,615 | 32.4% | $48,060 | 31.3% |
| Seller 2 | — | — | 2,292 | 5.9 | 23,463 | 37.5 | 3,862 | 8.6 | 29,617 | 19.3 |
| Seller 3 | — | — | 2,463 | 6.3 | 5,214 | 8.3 | 15,435 | 34.2 | 23,112 | 15.0 |
| Seller 4 | — | — | 8,871 | 22.7 | 3,780 | 6.1 | — | — | 12,651 | 8.2 |
| Seller 5 | — | — | 8,375 | 21.4 | 398 | 0.6 | — | — | 8,773 | 5.7 |
| Seller 6 | — | — | 1,167 | 3.0 | — | — | 4,773 | 10.6 | 5,940 | 3.9 |
| Seller 7 | $1,397 | 20.2% | — | — | 1,218 | 2.0 | — | — | 2,615 | 1.7 |
| Seller 8 | 2,590 | 37.5 | — | — | — | — | — | — | 2,590 | 1.7 |
| Seller 9 | 1,078 | 15.6 | — | — | — | — | — | — | 1,078 | 0.7 |
| Seller 10 | 729 | 10.5 | — | — | — | — | — | — | 729 | 0.5 |
| Other | 1,117 | 16.2 | 2,640 | 6.8 | 8,229 | 13.2 | 6,388 | 14.2 | 18,374 | 12.0 |
|  | $6,911(1) | 100.0% | $39,030 | 100.0% | $62,525 | 100.0% | $ 45,073 | 100.0% | $153,539 | 100.0% |
| Adjustments | (755) | | (552) | | (981) | | (171) | | (2,459) | |
| Adjusted cost | $6,156 | | $38,478 | | $61,544 | | $ 44,902 | | $151,080 | |

(1) Includes $2.0 million in receivables portfolios purchased as part of the West Capital acquisition.

Capital expenditures for fixed assets were $0.9 million for the six months ended June 30, 2003. During the six months ended June 30, 2003, $0.5 million of the capital expenditures were funded through a capital lease. The remaining capital expenditures were funded with internal cash flow.

Net cash used in financing activities was $7.2 million for the six months ended June 30, 2003, compared to $9.8 million used for the six months ended June 30, 2002. This reflected $46.6 million in repayment of principal during the six months ended June 30, 2003 and was partially offset by borrowings of $40.0 million during the six months ended June 30, 2003 to fund new portfolio purchases. The repayment of principal includes the repayment in full of Securitization 99-1 and the Warehouse facility as discussed in Notes 3 and 6 of the unaudited interim 2003 condensed consolidated financial statements. This compares to borrowings of $28.1 million for the six months ended June 30, 2002 to fund new portfolio purchases and $41.9 million in repayment of principal during the six months ended June 30, 2002 under our existing portfolio financing facilities. Also during the six months ended June 30, 2002, we received $4.6 million in net proceeds from the sale of our Series A Convertible Preferred Stock.

***Year Ended December 31, 2002 Compared to December 31, 2001.***

The following table summarizes the collections by collection channel *(in thousands)*:

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | 2002 | 2001 | Change | Percentage Change |
| Collection sites | $ 94,997 | $64,160 | $30,837 | 48.1% |
| Legal collections | 27,620 | 16,325 | 11,295 | 69.2 |

| | | | | |
|---|---|---|---|---|
| Sales | 18,545 | 1,768 | 16,777 | 948.9 |
| Other | 7,646 | 798 | 6,848 | 858.1 |
| Gross collections | $148,808 | $83,051 | $65,757 | 79.2 |

We collected $148.8 million during the year ended December 31, 2002 from all portfolios, an increase of $65.8 million, or 79%, from the $83.0 million collected during 2001. Collections on owned portfolios

43

**Table of Contents**

increased by approximately $67.9 million or 97% from approximately $70.1 million during the year ended December 31, 2001 to approximately $138.0 million for the year ended December 31, 2002. The source of the improvement was approximately $79.7 million from the Secured Financing Facility portfolios. Offsetting this improvement was a $2.4 million reduction in collections on the 99-1 Securitization, a $1.0 million reduction in collections on the Warehouse Facility, a $1.5 million reduction from wholly owned portfolios, and a $6.7 million reduction in the 98-1 Securitization.

The $67.9 million increase in collections on owned portfolios is offset by approximately $2.5 million in lower collections related to serviced portfolios. During the year ended December 31, 2001, we collected approximately $13.0 million on serviced portfolios compared to approximately $10.5 million during the year ended December 31, 2002. In February 2003, we returned all exhausted receivables to the owner of these portfolios; however, we have retained the servicing rights for receivables placed in the attorney network. As a result of this change, servicing fee income will decline in 2003.

We currently utilize various business channels for the collection of charged-off credit cards and other receivables. During 2001 and 2002, we resumed purchasing charged-off unsecured consumer loans and auto loan deficiencies. We purchased $0.4 million and $1.5 million in unsecured consumer loans in 2001 and 2002, respectively. Collections related to the unsecured consumer loans amounted to $0.1 million in 2001 and $2.9 million in 2002. We also purchased $0.4 million in auto loan deficiencies in December 2002.

Cash flow from operations improved $15.8 million from $8.9 million for the year ended December 31, 2001 to $24.7 million for the year ended December 31, 2002. First, this reflects the 79% growth in total gross collections of $65.8 million from 2001 to 2002. Additionally, we improved our ratio of total cash basis operating expenses and interest to total gross collections from 60% in 2001 to 44% in 2002. The combination of these two trends resulted in the cash from operations increasing from a 11% retention of gross collections in 2001 to a 17% retention in 2002.

Our primary investing activity is the purchase of new receivables portfolios. We purchase receivables portfolios directly from issuers and from resellers as well as from brokers that represent various issuers. Purchases affect cash flows in two ways. In periods in which we make portfolio purchases, we provide 10% of each portfolio's purchase price (25% for certain non-credit card receivables purchased) as our equity contribution. In subsequent periods, recoveries on the purchased portfolios produce cash flow. We carefully evaluate portfolios to bid on only those that meet our selective targeted return profile.

We purchased $62.5 million in new receivables during the year ended December 31, 2002, up $23.5 million or 60% from the $39.0 million purchased during 2001. In addition, we recovered $51.2 million in collections against the cost basis of our portfolios and our investment in the retained interest in 2002; up $34.8 million, or 212.2%, from the recoveries of $16.4 million of recoveries during 2001.

Capital expenditures for fixed assets and capital leases were $0.7 million for the year ended December 31, 2002 compared to $0.4 million for the year ended December 31, 2001. During the years ended December 31, 2002 and December 31, 2001, all purchases of capital expenditures were funded with internal cash flow.

Net cash used in financing activities was $14.2 million for the year ended December 31, 2002, compared to $13.4 million provided by financing activities during the year ended December 31, 2001. This reflected $79.7 million in repayment of principal in 2002 under our existing portfolio financing facilities, and which was partially offset by borrowings of $62.2 million in 2002 used to fund new portfolio purchases. These compare to borrowings of $28.9 million in 2001 to fund new portfolios purchases and $14.4 million in repayment of principal in 2001 under our existing portfolio financing facilities.

In addition, we obtained net proceeds of $4.6 million from the sale of the Series A Convertible Preferred Stock during 2002.

44

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JAMES BLOUNT, | ) | |
| individually and on behalf of the | ) | |
| class defined herein, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 2331 |
| | ) | Judge Aspen |
| vs. | ) | Magistrate Judge Keys |
| | ) | |
| MIDLAND CREDIT MANAGEMENT, INC.; | ) | |
| MIDLAND FUNDING NCC-2 CORPORATION; | ) | |
| and ENCORE CAPITAL GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by 28 U.S.C. §1746, that the following statements are true:

**1.** Edelman, Combs, Latturner & Goodwin, LLC, has 5 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, and Michelle R. Teggelaar and 9 associates.

**2.** **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School. From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases). In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982. From the end of 1985 he has been in private practice in downtown Chicago. Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions. He is the co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Payday Loans: Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection: The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995); author of An Overview of The Fair Debt Collection Practices Act, in Financial Services Litigation, Practicing Law Institute (1999); co-author of Residential Mortgage Litigation, in Financial Services Litigation, Practicing Law Institute (1996); author of Automobile Leasing: Problems and Solutions, 7 Loy.Consumer

1

L.Rptr. 14 (1994); author of <u>Current Trends in Residential Mortgage Litigation</u>, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); author of <u>Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Consumers</u>, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of <u>Illinois Consumer Law</u> (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, <u>Attorney Liability Under the Fair Debt Collection Practices Act</u> (Chicago Bar Ass'n 1996); author of <u>The Fair Debt Collection Practices Act: Recent Developments</u>, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994). He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Court for the District of Arizona, United States District Court for the District of Connecticut, and the Supreme Court of Illinois. He is a member of the Northern District of Illinois trial bar.

3.      **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School. She formerly supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law. She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991. Decisions in which she was involved prior to joining the firm include: <u>Johnson v. Heckler</u>, 607 F.Supp. 875 (N.D.Ill. 1984), and 100 F.R.D. 70 (N.D. Ill. 1983); <u>Sanders v. Shephard</u>, 185 Ill.App.3d 719, 541 N.E.2d 1150 (1st Dist. 1989); <u>Maller v. Cohen</u>, 176 Ill.App.3d 987, 531 N.E.2d 1029 (1st Dist. 1988); <u>Wright v. Department of Labor</u>, 166 Ill.App.3d 438, 519 N.E.2d 1054 (1st Dist. 1988); <u>Barron v. Ward</u>, 165 Ill.App.3d 653, 517 N.E.2d 591 (1st Dist. 1987); <u>City of Chicago v. Leviton</u>, 137 Ill.App.3d 126, 484 N.E.2d 438 (1st Dist. 1985); <u>Jude v. Morrissey</u>, 117 Ill.App.3d 782, 454 N.E.2d 24 (1st Dist. 1983). She is a member of the Northern District of Illinois trial bar.

4.      **James O. Latturner** is a 1962 graduate of the University of Chicago Law School. Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma. From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions. His publications include Chapter 8 ("Defendants") in <u>Federal Practice Manual for Legal Services Attorneys</u> (M. Masinter, Ed., National Legal Aid and Defender Association 1989); <u>Governmental Tort Immunity in Illinois</u>, 55 Ill.B.J. 29 (1966); <u>Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations</u>, 2 Loy.Consumer L.Rep. 64 (1990), and <u>Illinois Consumer Law</u> (Chicago Bar Ass'n 1996). He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience. He has argued some 30 appeals, including two cases in the United States Supreme Court and two in the Illinois Supreme

Court.  Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers.  He is a member of the Northern District of Illinois trial bar.

> 5.      **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991).  She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.**  Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000); Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803  (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL);  Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996).  She is a member of the Northern District of Illinois trial bar.

> 6.      **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997). **Reported Cases:** Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc. 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572  (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL 299803 (N.D. Ill. 1998).

> 7.      **Associates**

> a.      **Francis R. Greene** is a graduate of Johns Hopkins University

3

(B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** Johnson v. Thomas, 342 Ill. App.3d 382, 794 N.E.2d 919 (1st Dist. 2003); Jolly v. Shapiro & Kreisman, 237 F. Supp. 2d 888 (N.D. Ill. 2002); Parker v. 1-800 Bar None, a Financial Corp., Inc. 2002 WL 215530 (N.D. Ill. 2002); Jiang v. Allstate Ins. Co. (199 F.R.D. 267); Hill v. AMOCO Oil Co. 2003 WL 262424, 2001 WL 293628 (N.D. Ill. 2003)**;** Roquet v. Arthur Anderson LLP 2002 WL 1900768 (N.D. Ill. 2002); White v. Financial Credit, Corp. 2001 WL 1665386 (N.D. Ill.); Ransom v. Gurnee Volkswagen 2001 WL 1241297 (N.D. Ill. 2001) and 2002 WL 449703 (N.D. Ill 2002); Doxie v. Impac Funding Corp. 2002 WL 31045387 (N.D. Ill. 2002); Levin v. Kluever & Platt LLC 2003 WL 22757763 and 2003 WL 22757764 (N.D. Ill. 2003); Pleasant v. Risk Management Alternatives 2003 WL 22175390 (N.D. Ill. 2003); Jenkins v. Mercantile Mortgage 231 F. Supp. 2d 737 (N.D. Ill. 2002); Hobson v. Lincoln Ins. Agency, Inc. 2001 WL 55528, 2001 WL 648958 (N.D. Ill. 2001), Anderson v. Lincoln Ins. Agency 2003 WL 291928, Hobson v. Lincoln Ins. Agency 2003 WL 338161 (N.D. Ill. 2003);  Handy v. Anchor Mortgage Corp., 464 F.3d 760 (7th Cir. 2006).  He is a member of the Northern District of Illinois trial bar.

       **b.**     **Julie Clark** (neé Cobolovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** Qualkenbush v. Harris Trust & Savings Bank 219 F. Supp.2d 935 (N.D. Ill.,2002); Covington-McIntosh v. Mount Glenwood Memory Gardens 2002 WL 31369747 (N.D.I ll.,2002), 2003 WL 22359626 (N.D. Ill. 2003); Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc., 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007); Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co., No. 1-07-0684, 2007 Ill. App. LEXIS 1194 (Ill. App. 1st Dist. Nov. 13, 2007).

       **c.**     **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum  laude,* 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** Clark v. Experian Info. Solutions, Inc., 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); DeFrancesco v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); Jeppesen v. New Century Mortgage Corp., 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); Benedia v. Super Fair Cellular, Inc., 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

       **d.**     **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:** Murray v. Sunrise Chevrolet, Inc., 441 F.Supp.2d 940 (N.D. Ill. 2006); Iosello v. Leiblys, Inc., 502 F. Supp.2d 782 (N.D. Ill. 2007); Claffey v. River Oaks Hyundai, Inc., 486 F. Supp.2d 776 (N.D. Ill. 2007).

       **e.**     **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:**  Pietras v. Sentry Ins. Co., 513 F. Supp.2d 983 (N.D. Ill. 2007); Hernandez v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); Balogun v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007).

    **f.**  **Tiffany N. Hardy** (admitted NY, DC, IL) is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001).

    **g.**  **Zachary Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

    **h.**  **Rupali Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois College of Law (J.D. 2007).

    **i.**  **Michael J. Aschenbrener** is a graduate of the University of Minnesota (B.A. 2001) and the Chicago-Kent College of Law, Illinois Institute of Technology (J.D. May 2007).

    **8.**  The firm also has 15 legal assistants, as well as other support staff.

    **9.**  Since its inception, the firm has recovered more than $500 million for consumers.

    **10.**  The types of cases handled by the firm are illustrated by the following:

    **11.**  **Mortgage charges and servicing practices:**  The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices.  These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation.  Decisions in the firm's mortgage cases include: <u>Christakos v. Intercounty Title Co.</u>, 196 F.R.D. 496 (N.D.Ill. 2000); <u>Johnstone v. Bank of America, N.A.</u>, 173 F.Supp.2d 809 (N.D.Ill. 2001); <u>Leon v. Washington Mut. Bank, F.A.</u>, 164 F.Supp.2d 1034 (N.D.Ill. 2001);  <u>Williamson v. Advanta Mortg. Corp.</u>, 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); <u>McDonald v. Washington Mut. Bank, F.A.</u>, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); <u>Metmor Financial, Inc. v. Eighth Judicial District Court</u>, No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); <u>GMAC Mtge. Corp. v. Stapleton</u>, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); <u>Leff v. Olympic Fed. S. & L. Ass'n</u>, 1986 WL 10636 (N.D.Ill. 1986); <u>Aitken v. Fleet Mtge. Corp.</u>, 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); <u>Poindexter v. National Mtge. Corp.</u>, 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); <u>Sanders v. Lincoln Service Corp.</u>, 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. 1993); <u>Robinson v. Empire of America Realty Credit Corp.</u>, 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); <u>In re Mortgage Escrow Deposit Litigation</u>, M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); <u>Greenberg v. Republic Federal S. & L. Ass'n</u>, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

    **12.**  The recoveries in the escrow overcharge cases alone are over $250 million.  <u>Leff</u> was the seminal case on mortgage escrow overcharges.

      **13.**     The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

      **14.**    **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric.  Conley v. Sears, Roebuck, 1:97cv11149 (D.Mass); Fisher  v. Lechmere Inc., 1:97cv3065, (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  Bessette v. Avco Financial Services, 230 F.3d 439 (1st Cir. 2000).

      **15.**    **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

      **a.**     Hidden finance charges resulting from pass-on of discounts on auto purchases.  Walker v. Wallace Auto Sales, Inc., 155 F.3d 927, 1998 U.S. App. LEXIS 22663 (7th Cir. 1998).

      **b.**     Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 1998 U.S.App. LEXIS 16434 (7th Cir. 1998); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); Slawson v. Currie Motors Lincoln Mercury, Inc., 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); Cirone-Shadow v. Union Nissan, Inc., 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); Chandler v. Southwest Jeep-Eagle, Inc., 1995 U.S. Dist. LEXIS 8212 (N.D.Ill., June 8, 1995); Shields v. Lefta, Inc., 1995 U.S.Dist. LEXIS 7807 (N.D.Ill., June 5, 1995).

      **c.**     Spot delivery.  Janikowski v. Lynch Ford, Inc., 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. 1994);  Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

      **d.**     Force placed insurance.  Bermudez v. First of America Bank Champion, N.A., 860 F.Supp. 580 (N.D.Ill. 1994); Travis v. Boulevard Bank, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); Moore v. Fidelity Financial Services, Inc., 884 F. Supp. 288 (N.D.Ill. 1995).

      **e.**     Improper obligation of cosigners.  Lee v. Nationwide Cassell, 174 Ill.2d 540, 675 N.E.2d 599 (1996); Taylor v. Trans Acceptance Corp., 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995).

      **f.**     Evasion of FTC holder rule.  Brown v. LaSalle Northwest Nat'l Bank, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 1993 U.S.Dist.

LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

      **16.**    These cases also had a substantial effect on industry practices. The warranty cases, such as <u>Grimaldi</u>, <u>Gibson</u>, <u>Slawson</u>, <u>Cirone-Shadow</u>, <u>Chandler</u>, and <u>Shields</u>, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

      **17.**    **Predatory lending practices:** The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, mostly as class actions. <u>Livingston v. Fast Cash USA, Inc.</u>, 753 N.E.2d 572 (Ind. Sup. Ct. 2001); <u>Williams v. Chartwell Fin. Servs.</u>, 204 F.3d 748 (7th Cir. 2000); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u>, 01 C 4488, 2002 WL 215530 (N.D.Ill., Feb 12, 2002); <u>Gilkey v. Central Clearing Co.</u>, 202 F.R.D. 515 (E.D.Mich. 2001); <u>Van Jackson v. Check 'N Go of Ill., Inc.</u>, 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp. 2d 1085 (N.D.Ill. 2000); <u>Henry v. Cash Today, Inc.</u>, 199 F.R.D. 566 (S.D.Tex. 2000); <u>Donnelly v. Illini Cash Advance, Inc.</u>, 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); <u>Jones v. Kunin</u>, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); <u>Davis v. Cash for Payday</u>, 193 F.R.D. 518 (N.D.Ill. 2000); <u>Reese v. Hammer Fin. Corp.</u>, 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677 (N.D.Ill., Nov. 29, 1999); <u>Pinkett v. Moolah Loan Co.</u>, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); <u>Gutierrez v. Devon Fin. Servs.</u>, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); <u>Vance v. National Benefit Ass'n</u>, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

      **18.**    **Other consumer credit issues:** The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

      **a.**    Phony nonfiling insurance. <u>Edwards v. Your Credit Inc.</u>, 148 F.3d 427, 1998 U.S. App. LEXIS 16818 (5th Cir. 1998); <u>Adams v. Plaza Finance Co.</u>, 1999 U.S. App. LEXIS 1052 (7th Cir., January 27, 1999); <u>Johnson v. Aronson Furniture Co.</u>, 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

      **b.**    The McCarran Ferguson Act exemption. <u>Autry v. Northwest Premium Services, Inc.</u>, 144 F.3d 1037, 1998 U.S. App. LEXIS 9564 (7th Cir. 1998).

      **c.**    Loan flipping. <u>Emery v. American General</u>, 71 F.3d 1343 (7th Cir. 1995). <u>Emery</u> limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

      **d.**    Home improvement financing practices. <u>Fidelity Financial Services, Inc. v. Hicks</u>, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal

denied, 141 Ill.2d 539, 580 N.E.2d 112; <u>Heastie v. Community Bank of Greater Peoria</u>, 690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990). <u>Heastie</u> granted certification of a class of over 6,000 in a home improvement fraud case.

   **e.** Arbitration clauses. <u>Wrightson v. ITT Financial Services</u>, 617 So.2d 334 (Fla. 1st DCA 1993).

   **f.** Insurance packing. <u>Elliott v. ITT Corp.</u>, 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

   **19.** **Automobile leases:**  The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions. Decisions in these cases include <u>Lundquist v. Security Pacific Automotive Financial Services Corp.</u>, Civ. No. 5:91-754 (TGFD) (D.Conn.), <u>aff'd</u>, 993 F.2d 11 (2d Cir. 1993); <u>Kedziora v. Citicorp Nat'l Services, Inc.</u>, 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); <u>Johnson v. Steven Sims Subaru and Subaru Leasing</u>, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); <u>McCarthy v. PNC Credit Corp.</u>, 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); <u>Kinsella v. Midland Credit Mgmt., Inc.</u>, 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); <u>Highsmith v. Chrysler Credit Corp.</u>, 18 F.3d 434 (7th Cir. 1994); <u>Black v. Mitsubishi Motors Credit of America, Inc.</u>, 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); <u>Simon v. World Omni Leasing Inc.</u>, 146 F.R.D. 197 (S.D.Ala. 1992).  Settlements in such cases include <u>Shepherd v. Volvo Finance North America, Inc.</u>, 1-93-CV-971 (N.D.Ga.)($8 million benefit); <u>McCarthy v. PNC Credit Corp.</u>, 291 CV 00854 PCD (D.Conn.); <u>Lynch Leasing Co. v. Moore</u>, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); <u>Blank v. Nissan Motor Acceptance Corp.</u>, 91 L 8516 (Circuit Court of Cook County, Illinois); <u>Mortimer v. Toyota Motor Credit Co.</u>, 91 L 18043 (Circuit Court of Cook County, Illinois); <u>Duffy v. Security Pacific Automotive Financial Services, Inc.</u>, 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

   **20.** <u>Lundquist</u> and <u>Highsmith</u> are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act.  As a result of the <u>Lundquist</u> case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

   **21.** **Collection practices:**  The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual.  Decisions in these cases include: <u>Jenkins v. Heintz</u>, 25 F.3d 536 (7th Cir. 1994), aff'd 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); <u>Johnson v. Revenue Management Corp.</u>, 169 F.3d 1057, 1999 U.S. App. LEXIS 3142 (7th Cir. 1999); <u>Keele v. Wexler & Wexler</u>, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996)

(class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589, 1998 U.S.App. LEXIS 15029 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338, 1997 U.S.App. LEXIS 5000 (7th Cir., Mar. 17, 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 1998 U.S.App. LEXIS 16112 (2d Cir. 1998); Young v. Citicorp Retail Services, Inc., 1998 U.S.App. LEXIS 20268 (2d Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 1997 U.S. App. LEXIS 16786 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995); Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Laws v. Cheslock, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999);Davis v. Commercial Check Control, Inc., 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995). Settlements in such cases include Boddie v. Meyer, 93 C 2975 (N.D.Ill.); and Cramer v. First of America Bank Corporation, 93 C 3189 (N.D.Ill.).

    22.    Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  I argued it before the Supreme Court and Seventh Circuit.  Avila v. Rubin is a leading decision on phony "attorney letters."

    23.    **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions.  One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.   Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006); Murray v. GMAC Mortgage Corp., 05 C 1229, _____ F.Supp.2d _____, 2007 U.S. Dist. LEXIS 26726 (N.D.Ill. April 10, 2007); Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007 U.S. Dist. LEXIS 27491 (N.D.Ind.,  April 12, 2007); In re Ocean Bank, 06  C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion,  2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006); Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19,

2006); <u>Bonner v. Home 123 Corp.</u>, 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); <u>Murray v. Sunrise Chevrolet , Inc.</u>, 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and <u>Murray v. Finance America, LLC</u>, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006).  More than 15 such cases have been settled on a classwide basis.

       24.    **Class action procedure:**  Important decisions include <u>Crawford v. Equifax Payment Services, Inc.</u>, 201 F.3d 877 (7th Cir. 2000); <u>Blair v. Equifax Check Services, Inc.</u>, 181 F.3d 832 (7th Cir. 1999); <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344 (7th Cir. 1997); and <u>Gordon v. Boden</u>, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

       25.    **Landlord-tenant:** The firm has brought a number of class actions against landlords for various matters including failing to pay interest on security deposits or commingling security deposits, breach of the warranty of habitability, improper late charges, and various violations of the CRLTO. Reported decisions include: <u>Wang v. Williams,</u>343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); <u>Onni v. Apartment Management and Investment Co.</u>, 344 Ill. App. 3d 1099; 801 N.E.2d 586 (2d Dist. 2003) (case challenging improper late charges, which later settled on a class basis for $200,000); <u>Dickson v. West Koke Mill Village P'Ship</u>, 329 Ill.App.3d 341 (4th Dist. 2002).  Illustrative cases include: <u>Hale v. East Lake Management & Developmental Corp., et al.</u>, 00 CH 16139, in the Cook County Circuit Court, Judge Madden granted class certification for tenants who had not been paid their security deposit interest after the end of each twelve month rental period.  The East Lake case later settled on a classwide basis for over $400,000.

       26.    Some of the other reported decisions in our cases include:  <u>Elder v. Coronet Ins. Co.</u>, 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); <u>Smith v. Keycorp Mtge., Inc.</u>, 151 Bankr. 870 (N.D.Ill. 1992); <u>Gordon v. Boden</u>, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); <u>Armstrong v. Edelson</u>, 718 F.Supp. 1372 (N.D.Ill. 1989); <u>Newman v. 1st 1440 Investment, Inc.</u>, 1993 U.S.Dist. LEXIS 354 (N.D.Ill. 1993); <u>Mountain States Tel. & Tel. Co. v. District Court</u>, 778 P.2d 667 (Colo. 1989); <u>Disher v. Fulgoni</u>, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st Dist. 1984); <u>Harman v. Lyphomed, Inc.</u>, 122 F.R.D. 522 (N.D.Ill. 1988); <u>Haslam v. Lefta, Inc.</u>, 1992 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); <u>Source One Mortgage Services Corp. v. Jones</u>, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

       27.    Gordon v. Boden is the first decision approving "fluid recovery" in an Illinois class action.  <u>Elder v. Coronet Insurance</u> held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

                            s/ Daniel A. Edelman       
                            Daniel A. Edelman

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603

(312) 739-4200
(312) 419-0379 (FAX)

11